UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

NATASHA FELICIA SANTANGELO,

                                Plaintiff,

-vs-

DECISION AND ORDER

18-CV-6199-CJS

ANDREW M. SAUL, *Commissioner of Social Security*,[1]

                                Defendant.
_____

## APPEARANCES

For Plaintiff:                          Justin M. Goldstein, Esq.
                                      Kenneth R. Hiller, Esq.
                                      Law Offices of Kenneth Hiller, PPLC
                                      6000 North Bailey Avenue, Suite 1A
                                      Amherst, NY 14226
                                      (716) 564-3288

For the Commissioner:        Michael Arlen Thomas, Esq.
                                      Office of the General Counsel
                                      Social Security Administration
                                      1961 Stout Street, Suite 4169
                                      Denver, CO 80294
                                      (303) 844-1190

                                      Oona Marie Peterson, Esq.
                                      Social Security Administration
                                      Office of General Counsel
                                      26 Federal Plaza, Room 3904
                                      New York, NY 10278
                                      (212) 264-0768

                                      Kathryn L. Smith, AUSA
                                      U.S. Attorney's Office
                                      100 State Street
                                      Rochester, NY 14614
                                      (585) 263-6760

---

[1] The president nominated Andrew M. Saul to be Commissioner of Social Security and the Senate confirmed his appointment on June 4, 2019. He is substituted pursuant to Fed. R. Civ. P. 25(d). The Clerk is directed to amend the caption to comply with this substitution.

- 1 -

## INTRODUCTION

**Siragusa, J.** This Social Security disability case is here for review pursuant to 42 U.S.C. § 405(g) from the Commissioner's decision denying disability benefits. Now before the Court are Plaintiff's motion for judgment on the pleadings, filed on October 6, 2018, ECF No. 10, and the Commissioner's cross-motion for judgment on the pleadings, filed on January 4, 2019, ECF No. 15. For the reasons stated below, the Court grants Plaintiff's motion and remands the case for a new hearing.

## BACKGROUND

Plaintiff filed an application for disability benefits under Title II of the Social Security Act on March 22, 2015, alleging that her disability began on January 5, 2014. The Social Security Administration denied her claim initially on June 3, 2015, and she requested and was granted a hearing before an Administrative Law Judge ("ALJ"). The hearing was held on November 3, 2016, via video conference, with the claimant in Rochester, New York, and the ALJ in Alexandria, Virginia. Plaintiff was represented by a non-attorney at the hearing. The ALJ issued an unfavorable decision on January 13, 2017. Plaintiff appealed to the Social Security Administration's Appeals Council and provided additional evidence. The Appeals Council denied her appeal on January 9, 2018, making the ALJ's decision the Commissioner's final decision. Plaintiff filed her complaint in this Court through counsel on March 9, 2018. ECF No. 1.

## THE ALJ'S DECISION

Plaintiff claims to suffer from osteoarthritis in her left knee, bilateral carpal tunnel syndrome, depression, anxiety, and diabetes. The ALJ found everything but diabetes to be severe impairments. In that light, the ALJ's assessed Plaintiff's residual functional capacity ("RFC"). This assessment is contained in pages 41 through 46 in the Record. The ALJ first summarized Plaintiff's testimony concerning the osteoarthritis in her left knee and carpel

tunnel syndrome along with depression and anxiety. R. 41. The ALJ then summarized Plaintiff's testimony and her written application pertaining to her ability to function. *Id*. Plaintiff testified she could stand for ten minutes, walk for five minutes before needing a break and lift about five pounds. *Id*. However, in her Function Report (dated April 25, 2015), when asked in section C, "Explain how your illnesses, injuries, or conditions affect any of the following: Lifting; Standing; Walking; Sitting; Climbing stairs; Kneeling; Squatting; Reaching; Using hands; Seeing; Hearing; [and] Talking," she left every category but two blank. R. 231–32. Only for "Seeing" and "Talking" did she place any responses (for seeing she wrote "glasses" and for talking she wrote "hesitant to talk"). "[T]he claimant has the burden on the first four steps." *Shaw v. Chater*, 221 F.3d 126, 132 (2d Cir. 2000). By leaving the Function Report's section C essentially blank, Plaintiff undermined her testimony at the hearing about the limitations of her physical abilities. The ALJ noted this discrepancy in his decision at page 42.

The ALJ observed that Plaintiff lives in a home with stairs, in which the bedrooms and bathrooms are on the second level, strongly implying that she is capable of climbing and descending stairs. R. 42. She testified about and reported that she could perform the activities of daily living.

The Record also shows a lack of treatment for her knee or wrist, and that her anxiety and depression were successfully treated with medications. He pointed out that she began to complain of knee pain in late January 2015, which contradicted her allegation that the pain began in January 2014. *Cf.* R. 329 ("Natasha is a 41-year-old female who presents today with complaints of left knee pain for 2–3 weeks." Jan. 23, 2005 Office Visit to Webster Family Medicine), *with* R. 200 ("I became unable to work because of my disabling condition on January 5, 2014," May 27, 2015, Application Summary for Disability Insurance Benefits).

The ALJ also considered the medical evidence in the Record. In September 2015, Plaintiff used Percocet occasionally for her knee pain. R. 600 ("Left knee pain—is still occasionally using Percocet."). Prior to an October 2015 arthroscopic surgery for what a magnetic resonance image showed was a torn meniscus in her left knee, along with degenerative change, and joint effusion, Plaintiff was exercising up to three times a week in May 2015. R. 512 ("Natasha exercises 3 times a week."). After surgery, she exercised up to five times per week. R. 552 ("Natasha exercises 5 times a week," Oct. 2015); R. 559 ("Natasha exercises 5 times a week," Apr. 2016).

Stacy Hom, M.D., ("Dr. Hom") a treating physician at Webster Family Medicine, completed a Physical Assessment for Determination of Employability for the Monroe County Department of Human Services on November 30, 2015. R. 638. Dr. Hom indicated that Plaintiff had been a patient at her clinic since June of 2013. *Id*. Dr. Hom further indicated that the expected duration of the limitations she listed was six months. R. 639. Additionally, Dr. Hom indicated that during that six-month period, Plaintiff would need flexibility to sit or stand as needed for comfort, that she could not lift, bend, squat, kneel, remain sitting or standing for too long, and could not repetitively use her hands, and that she could work up to twenty hours per week with those reasonable accommodations. R. 638. Dr. Hom also indicated that Plaintiff was limited to sitting only two to four hours, and very limited (one to two hours) in walking, standing, pushing, pulling, bending, seeing, hearing, speaking, lifting, or carrying. R. 641.

The ALJ considered other reports from Dr. Hom: "In February 2016, Dr. Hom refrained from commenting on the claimant's disability due to mental illness [R. 450]. Then in April 2016, Dr. Hom provided an opinion that the claimant was unable to tolerate holding a meaningful job, complete tasks, poor concentration [R. 643]." The ALJ assigned "very little

weight" to Dr. Hom's opinion because her "opinions related to the claimant's mental functioning which is beyond the scope of Dr. Hom's general practice," and the opinion was "inconsistent with the accepted findings and reported abilities." R. 45. The ALJ cited to Plaintiff's hearing testimony, her reported activities of daily living (Exhibit 3E, p. 3, 6 & 9), Kristin Luna, Psy.D.'s ("Dr. Luna") consultative examination (Exhibit 5F), Dr. Kranz's progress notes from June 2016 (Exhibit 13F pp. 29–30), and LCSW-R Mary Scollan's ("Ms. Scollan") progress note from September 2016 (Exhibit 16F, p. 8).

The ALJ pointed out that Plaintiff denied depression symptoms in May 2014. R. 44. He cited to Exhibit 2F page 26, which is R. 308. That page contains no information regarding depression, but on the following page, R. 309, this statement appears: "Depression—no changes yet. Still taking 1 pill a day. Mood is ok, not depressed." R. 309.

Dr. Hom completed another physical assessment form on April 28, 2016. R. 642–43. In that assessment, Dr. Hom indicated Plaintiff was limited to standing and sitting for one hour and that she was "unable to tolerate holding meaningful job, complete tasks, keep obligations, poor concentration & communication." R. 643. Dr. Hom also noted that Plaintiff denied psychiatric treatment as of May 2015, which the ALJ commented was "inconsistent with her allegations that he[r] mental impairments began in January 2014". R. 44. The ALJ cites to Exhibit 5F, page 2, which is R. 405, and contains this statement by Dr. Luna: "The claimant has never been psychiatrically hospitalized. She was previously receiving outpatient mental health services at Westchester Mental Health from 1989 until 2000. She is not currently receiving outpatient mental health services." R. 405. During a January 5, 2015, examination, Physician's Assistant Julie Anne Leo reported that Plaintiff's mood, affect, behavior, and though content were all "normal." R. 460.

Based on Plaintiff's testimony about her abilities, and other exhibits in the Record, the ALJ decided to "assign little weight to these opinions of Dr. Hom." R. 43; 224 & 230 (Plaintiff's reported activities of daily living); R. 403 (Harbinger Toor, M.D., May 2015 medical source statement: "She has moderate to marked limitation standing/walking long time. Pain interferes with her balance. No other medical limitation suggested."); R. 408 (Kristina Luna, Psy.D., May 2015 medical source statement: "The claimant has no limitations in her ability to follow and understand simple directions and instructions, perform simple tasks independently, maintain a regular schedule, learn new tasks, and make appropriate decisions. She is mildly limited in her ability to relate adequately with others and appropriately deal with stress. She is moderately limited in her ability to maintain attention and concentration and perform complex tasks independently. Difficulties are caused by distractibility."). Therefore, the Court finds that the ALJ adequately explained why he gave Dr. Hom's opinion "little weight."

The ALJ also gave little weight to Dr. Toor's opinion because his opinion "was based on a one-time examination [and was] not completely consistent with the accepted findings and reported abilities." R. 43. In support of giving Dr. Toor's opinion little weight, the ALJ referred to the hearing testimony, and other medical opinions in the record.

Regarding her consultative psychiatric evaluation in May 2015, Dr. Luna's conclusions showed the ALJ that Plaintiff "maintained coherent and logical thought processes as well as good insight and judgment despite a dysthymic mood" and only a "mild impairment of her attention, concentration, and memory." R. 44. The ALJ concluded that "[t]hese findings do not support the degree of severity alleged." *Id*. The ALJ also observed that medical evidence from August 2015 showed normality, and in June 2016, Pebble Kranz, M.D., of Webster Family

Medicine, noted that Plaintiff's mood was depressed, her thought process was normal, her perception was within normal limits and her judgment was intact. R. 617.

On August 24, 2016, Mary Scollan, LCSWR ("Ms. Scollan"), completed a psychological assessment. R. 645. In it, she indicated that Plaintiff had normal functioning in the areas of capacity to follow, understand and remember simple instructions and directions. R. 648. She also had normal functioning in the area of having the capacity to perform simple and complex tasks independently. She was moderately limited (that is, unable to function 10%–25% of the time) in the capacity to perform low stress and simple tasks. Finally, she was very limited (that is, unable to function 25% or more of the time) in the capacity to maintain attention and concentration for rote tasks, the capacity to regularly attend to a routine and maintain a schedule, and the capacity to maintain basic standards of hygiene and grooming. R. 648. The ALJ addressed this report and assigned little weight to it since "Ms. Scollan is not an 'acceptable medical source' under the Regulations (20 C.F.R. § 404.1513(a) . . . ." R. 45.

The ALJ further considered the June 2015 opinion of state-examining psychologist S. Juriga, Ph.D. ("Dr. Juriga") R. 45, 97.[2] Dr. Juriga noted that Plaintiff could frequently lift and carry up to 10 pounds, stand or walk with normal breaks for 2 hours, sit with normal breaks for 6 hours, and was unlimited in pushing and pulling. R. 94. Regarding her mental residual functional capacity, he stated the following:

> Does the individual have understanding and memory limitations?
>
> Yes
>
> <u>Rate the individual's understanding and memory limitations</u>:
>
> The ability to remember locations and work-like procedures.

---

[2] The report in the Record is co-signed by P. Belardinelli, SDM. R. 95.

> Not significantly limited

The ability to understand and remember very short and simple instructions.

> Not significantly limited

The ability to understand and remember detailed instructions.

> Moderately limited

Explain in narrative form the presence and degree of specific understanding and memory capacities and/ or limitations:

> Mild impairment due to emotional distress. She could remember 3 of 3 objects immediately and 1 of 3 after 5 minutes. She could complete 5 digits forward and none backward.

Does the individual have sustained concentration and persistence limitations?

> Yes

<u>Rate the individual's sustained concentration and persistence limitations</u>:

The ability to carry out very short and simple instructions.

> Not significantly limited

The ability to carry out detailed instructions.

> Moderately limited

The ability to maintain attention and concentration for extended periods.

> Moderately limited

The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances.

> Moderately limited

The ability to sustain an ordinary routine without special supervision.

> Not significantly limited

The ability to work in coordination with or in proximity to others without being distracted by them.

> Not significantly limited

The ability to make simple work-related decisions.

> Not significantly limited

The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.

> Moderately limited

Explain in narrative form the sustained concentration and persistence capacities and/or limitations:

> Mildly impaired due to anxiety and nervousness. She is distractible. She was unable to complete serial 3's.

Does the individual have social interaction limitations?

> No

Does the individual have adaptation limitations?

> Yes

<u>Rate the individual's adaptation limitations</u>:

The ability to respond appropriately to changes in the work setting.

> Moderately limited

The ability to be aware of normal hazards and take appropriate precautions.

> Moderately limited

The ability to travel in unfamiliar places or use public transportation.

> Moderately limited

The ability to set realistic goal or make plans independently of others.

> Moderately limited

Explain in narrative form the adaptation capacities and/or limitations:

> She can drive but she will not take public transportation. She has a lot of anxiety leaving her home and relys [sic] on family members.

MRFC - Additional Explanation

No history of psychiatric hospitalization. No current mental health treatment. Her insight and judgment are good. She can understand, carry out and remember simple instructions. She can use appropriate judgment to make

simple, work related decisions. She can respond appropriately to supervision, coworkers, work situations and deal with changes in a routine work setting most of the time.

R. 96–97. The ALJ assigned "some weight" to Dr. Juriga's opinions because "these opinions are consistent with the reported abilities." R. 45.

The ALJ addressed Plaintiff's work history, noting that she was fired from her last employment at Heritage Christian Services because "she left a resident in a vehicle," and not due to anxiety. R. 45, 412.

## DISCUSSION

Plaintiff raises the following as errors committed by the Commissioner: (1) the Appeals Council failed to evaluate new and material evidence pursuant to appropriate legal standards; and (2) the ALJ's residual functional capacity assessment is unsupported by substantial evidence and is inconsistent with the legal standards. Pl.'s Mem. of Law 1, Oct. 6, 2018, ECF No. 10-1.

### *The Appeals Council*

The Appeals Council denied Plaintiff's appeal on January 4, 2018. Plaintiff states that she submitted evidence of receiving physical therapy from Lindsay Dakin, Physical Therapist, on November 4, 2016, and that her "[f]lexion was limited to 102 on the right and 100 on the left." *Id*. 12; R. 10. Later that same month, she saw Katherine Rizzone, M.D. ("Dr. Rizzone"), and Colleen McTammany, P.A., who treated her for left knee pain. Dr. Rizzone noted that she had received a cortisone shot in January, which relieved her pain "for a few months," but that "[t]he last injection and round of PT did not help significantly." R. 12. The doctor suggested a referral for acupuncture, R. 15, however a later progress note mentioned acupuncture was not covered by her insurance, R. 17.

On November 29, 2016, John Elfar, M.D. ("Dr. Elfar"), saw Plaintiff for an orthopedic review. R. 15. He noted the following:

> Patient is seen today now status post EMG nerve conduction study that shows moderate-to-severe left median neuropathy and moderate right median neuropathy. There is some chronic bilateral mild ulnar neuropathy at each elbow. All of the numbness and tingling are from the radial three digits -- thumb, index, and middle finger.
>
> She would like to have the carpal tunnel release. We have discussed the nature of surgery, the nature of postoperative rehab, and the risks and benefits. I don't recommend the elbow surgery right at this time. She doesn't have a lot of pinkie numbness, and I think that this might be a quicker recovery for her. Certainly, if she does develop pinkie numbness, or her numbness isn't fully better, we can go and approach that later.
>
> We have also talked about bilateral simultaneous carpal tunnel releases. For now, we are going to plan a LEFT CARPAL TUNNEL RELEASE done under local plus sedation anesthesia at a surgery center. We will begin the scheduling process.
>
> We will see the patient back at the time of surgery. LEFT SIDE IS THE SURGICAL SIDE.

R. 16.

Michael Maloney, M.D. ("Dr. Maloney"), an orthopedic surgeon, examined Plaintiff on January 14, 2017, noting that "[s]he is tender somewhat out of proportion to the exam." R. 21. In his assessment her wrote:

> A 43-year-old with left knee pain that almost seems to be neuropathic in nature. She has had previous arthroscopy by another orthopedist. I did agree to obtain a new MRI. I explained that if her MRI is unremarkable, my thinking is that she is experiencing neurogenic pain, a complex regional pain syndrome and a pain treatment evaluation would be more appropriate as I would not have anything to offer her from an orthopedic standpoint. Certainly, physical therapy can be pursued. MRI has been ordered. We will look follow up and get back to her even electronically, if possible.

R. 21.

On February 3, 2017, Nicholas Pearson, D.O., F.E.L., and Dr. Maloney saw Plaintiff for her knee and made the following assessment and plan:

> Left knee degenerative joint disease.
>
> PLAN: As had been discussed previously, the patient's symptoms as well as pathology are not amenable to arthroscopic surgery at this time. As had been discussed previously, we will not be accepting the patient for chronic pain management. She will need to be managed by her primary care physician and possibly Pain Management which she will need to be referred to by her primary care physician. If she desires to see somebody in the arthroplasty division that could be a possibility; however, at her age, she is very young for a replacement. She will need to follow up with her primary care at this time.

R. 22.

Plaintiff underwent carpel tunnel surgery on February 1, 2017, and attended physical therapy thereafter. R. 23. The physical therapist on February 14, 2017, wrote that her prognosis was good. R. 24.

Plaintiff argues that the nerve conduction study on Plaintiff's wrist by Dr. Elfar conducted on November 29, 2016, "supports the severity of Plaintiff's carpal tunnel syndrome." Pl.'s Mem. 17. She argues that this evidence directly contradicts the ALJ's determination that, "[a]lthough the evidence shows that the claimant was diagnosed with knee osteoarthritis and carpal tunnel syndrome, the record lacks significant treatment evidence as of the alleged onset date. This suggests the impairments were not as severe as alleged." R. 42. Further, Plaintiff points to the ALJ's conclusion about her carpal tunnel syndrome, evidenced by his decision that "she testified that she must undergo additional tests to determine 'how bad it is.' (*e.g.* Hearing Testimony). This limited evidence related to her carpal tunnel is recent, which suggests the impairment was not as intense and frequent as alleged." R. 43. Plaintiff therefore argues:

> Thus, in contrast to the ALJ's finding that "the objective record fails to establish that the…carpal tunnel had intense, persistent, and limiting effect," the new and material evidence contains objective findings, surgical records, and postoperative surgical records showing that Plaintiff continued to have intense, persistent, and limiting effects following surgery. T 43. Thus, the evidence

shows a reasonable probability that it would change the outcome of the decision.

Pl.'s Mem. 17.

The Commissioner's regulation provides that the Appeals Council will review a case if it "receives additional evidence that is new, material, and relates to the period on or before the date of the hearing decision, and there is a reasonable probability that the additional evidence would change the outcome of the decision." 20 C.F.R. § 404.970(a)(5) (Dec. 16, 2016). However, this provision is limited by 20 C.F.R. § 404.970(b), which refers to the time deadlines in § 404.935. With regard to the additional evidence Plaintiff submitted to the Appeals Council, that body responded as follows:

> You submitted records from the University of Orthopedics and Rehabilitation dated November 4, 2016 through January 3, 2017 (11 pages). We find this evidence does not show a reasonable probability that it would change the outcome of the decision. We did not consider and exhibit this evidence.
>
> You submitted records from the University of Orthopedics and Rehabilitation dated February 3, 2017 through March 1, 2017 (7 pages). The Administrative Law Judge decided your case through January 13, 2017. This additional evidence does not relate to the period at issue. Therefore, it does not affect the decision about whether you were disabled beginning on or before January 13, 2017.

R. 2. The Court agrees that the new evidence submitted did not meet the Commissioner's rules for consideration by the Appeals Council. However, the Court concludes that the records from November 2016 through January 3, 2017, would not have undermined the ALJ's determination regarding the severity of Plaintiff's carpal tunnel syndrome. Therefore, the Appeals Council did not err by rejecting the post-decision evidence.

### The ALJ's RFC Determination

> Ordinarily, RFC is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule.

* * *

> Exertional capacity addresses an individual's limitations and restrictions of physical strength and defines the individual's remaining abilities to perform each of seven strength demands: Sitting, standing, walking, lifting, carrying, pushing, and pulling. Each function must be considered separately (e.g., "the individual can walk for 5 out of 8 hours and stand for 6 out of 8 hours"), even if the final RFC assessment will combine activities (e.g., "walk/stand, lift/carry, push/pull").

> * * *

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule)[7], and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

Titles II & XVI: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8P (S.S.A. July 2, 1996).

The Court now turns to Plaintiff's arguments regarding the ALJ's RFC determinations (both mental and physical). Plaintiff begins her argument with the proposition that the RFC determination is a medical one, citing *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330 (E.D.N.Y. 2010). The Commissioner directly contradicts this assertion in his brief: "The RFC finding is an administrative determination that is dispositive of whether a claimant is disabled under the Act. *See* 20 C.F.R. § 404.1545." Comm'r Mem. of Law 26, Jan. 1, 2019, ECF No. 15-1. The Court has read § 404.1545 and does not find support for the Commissioner's assertion. Instead, the Court finds the district court's opinion in *Hilsdorf* persuasive. There, the district court held that:

> Because an RFC determination is a medical determination, an ALJ who makes an RFC determination in the absence of supporting expert medical opinion has

> improperly substituted his own opinion for that of a physician, and has committed legal error. *See Woodford v. Apfel,* 93 F.Supp.2d 521, 529 (S.D.N.Y. 2000) ("An ALJ commits legal error when he makes a residual functional capacity determination based on medical reports that do not specifically explain the scope of claimant's work-related capabilities."); *Zorilla v. Chater,* 915 F. Supp. 662, 666–67 (S.D.N.Y. 1996) ("The lay evaluation of an ALJ is not sufficient evidence of the claimant's work capacity; an explanation of the claimant's functional capacity from a doctor is required.").

*Hilsdorf,* 724 F. Supp. 2d at 347. According to Westlaw, 28 cases in this district have cited *Hilsdorf* for the proposition in the quoted language from headnote 14 in the Westlaw publication of the decision. As the undersigned stated in *Stubbs v. Comm'r of Soc. Sec.*, No. 17-CV-6607, 2018 WL 6257431 (W.D.N.Y. Nov. 30, 2018),

> Cases in this District hold that an ALJ's RFC determination generally requires supporting medical evidence in the Record. Stemming from a 2010 Eastern District case, *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330 (E.D.N.Y. 2010), a long line of cases in this District follow the logic in the *Hilsdorf* case….

*Stubbs*, 2018 WL 6257431, at *6. Thus, the Court finds that the ALJ's RFC determination for Plaintiff's physical and mental capabilities must have support from medical evidence, except in cases involving relatively minor physical impairments. *Id*. at *7.

As Plaintiff points out, both Dr. Hom, her treating physician, and Dr. Toor, a consultative examiner, found limitations that are inconsistent with light work. The ALJ, though, gave little weight to either opinion. Light work is defined by the Commissioner as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

As early as 1972, the Second Circuit has held that a claimant's treating physician's opinion was to be given greater weight. *See Gold v. Sec. of H.E.W.*, 463 F.2d 38, 42 (2d Cir. 1972) (quoting *Walker v. Garnder*, 266 F. Supp. 998 (S.D. Ind. 1967) *and citing Teeter v. Flemming*, 270 F.2d 871, 874 (7th Cir. 1959). The Commissioner's current treating physician rule, which will no longer apply to claims filed after March 27, 2017, reads in part as follows:

> Generally, we give more weight to medical opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's medical opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight . . . . We will always give good reasons in our notice of determination or decision for the weight we give your treating source's medical opinion.

20 C.F.R. § 404.1527(c)(2) (Mar. 27, 2017). Consequently, the ALJ was required to give Dr. Hom's opinions controlling weight if they met the criteria above, or otherwise give a good explanation for not giving them controlling weight.

First, Plaintiff argues that the ALJ misread the record and limited Dr. Hom's opinion to a duration of six weeks. R. 43. However, the Court has read Dr. Hom's report at R. 639, and agrees with Plaintiff. Dr. Hom did indicate that the expected duration was six months, not six weeks. The report is dated December 29, 2015. R. 641. However, the statute's twelve-month durational requirement applies both to the impairment and to the claimant's inability to work. *Barnhart v. Walton*, 535 U.S. 212, 222–23 (2002).

Second, Plaintiff argues that the ALJ "does not discuss how any of the finding [sic] in the treatment notes [relate to] the ability to perform light work . . .," and argues that the Commissioner's reliance on the holding in *Monroe v. Colvin*, 676 F. App'x 5, 8–9 (2d Cir. 2017)

(summary order) is misplaced. Pl.'s Reply Mem. of Law 4, Jan. 24, 2019, ECF No. 16. Regarding *Monroe*, the Second Circuit panel wrote:

> Here, although the ALJ ultimately rejected Dr. Wolkoff's medical assessment, she relied on Dr. Wolkoff's treatment notes dating back before the alleged onset date. Not only do Dr. Wolkoff's notes include descriptions of Monroe's symptoms, but they also provide contemporaneous medical assessments of Monroe's mood, energy, affect, and other characteristics relevant to her ability to perform sustained gainful activity. The ALJ also considered Dr. Wolkoff's well-documented notes relating to Monroe's social activities relevant to her functional capacity—such as snowmobile trips, horseback riding, and going on multiple cruise vacations. Because the ALJ reached her RFC determination based on Dr. Wolkoff's contemporaneous treatment notes—while at the same time rejecting his *post hoc* medical opinion ostensibly based on the observations memorialized in those notes—that determination was adequately supported by more than a mere scintilla of evidence . . . .
>
> Likewise, because the ALJ based its RFC determination on Dr. Wolkoff's years' worth of treatment notes, it was not necessary for the ALJ to seek additional medical information regarding Monroe's RFC.

*Monroe*, 676 F. App'x at 8–9 (citations omitted).

In support of her argument, Plaintiff relies on the decision by the Honorable Michael A. Telesca in *Muhammad v. Colvin*, No. 16-CV-6369, 2017 WL 4837583 (W.D.N.Y. Oct. 26, 2017). There, Judge Telesca distinguished *Monroe* by quoting *Morales v. Colvin*, No. 3:16-CV-0003(WIG), 2017 WL 462626 (D. Conn. Feb. 3, 2017), where the district court wrote: "*Monroe* is distinguishable from this case because the ALJ here did not discuss treatment notes with any vocation or functional relevance when he formulated the RFC." *Morales*, 2017 WL 462626 at *3. Plaintiff contends that the ALJ did not "tie any of the raw medical data to Plaintiff's ability to stand, walk, lift, carry, push, pull, reach, and perform postural abilities required for a range of light work." Pl.'s Reply Mem. of Law 4.

The only discussion of Plaintiff's ability to lift, stand, and walk is from her hearing testimony. The ALJ's discussion of the medical records does not touch on these physical requirements for light work. It appears that the ALJ interpreted the raw medical evidence to

arrive at the conclusion that Plaintiff was physically capable of light work. Light work can "require[] a good deal of walking or standing. . . ." Considering that one of Plaintiff's primary problems is with her knee, it is surprising that the ALJ asked no questions of the vocational expert about the standing or walking requirements of the jobs identified in the light category that the vocational expert stated Plaintiff could perform. R. 83–87.

## CONCLUSION

The Court finds that the ALJ's physical RFC determination is not supported by substantial evidence. Accordingly, the Court grants Plaintiff's motion for judgment on the pleadings, ECF No. 10, and denies the Commissioner's motion, ECF No. 15. The Commissioner's decision is reversed pursuant to the fourth sentence of 42 U.S.C. § 405(g) and this matter is remanded to the Commissioner for a new hearing. The Clerk will close the case.

DATED:     September 16, 2019
           Rochester, New York

                                        /s/ Charles J. Siragusa
                                        CHARLES J. SIRAGUSA
                                        United States District Judge